UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


Linda Hawk

    v.                                Civil No. 05-cv-283-JD
                                         Opinion No. 2006 DNH 114
Land Air Express of
New England, Ltd.


O R D E R


    Linda Hawk brought claims of sexual harassment and
retaliation, under both state and federal law, against her former
employer, Land Air Express of New England, Ltd.[1]  See 42 U.S.C. §
2000e-5(f)("Title VII"); N.H. Rev. Stat. Ann. ("RSA") 354-A.
Land Air moves for summary judgment, contending that Hawk cannot
prove her claims.  Hawk objects to summary judgment.


Standard of Review

    Summary judgment is appropriate when "the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to a judgment as a matter of law."  Fed. R. Civ. P.
56(c).  The party seeking summary judgment must first demonstrate

---

    [1]Hawk brought suit in state court, and Land Air removed the
case to this court.

the absence of a genuine issue of material fact in the record.
See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A party
opposing a properly supported motion for summary judgment must
present competent evidence of record that shows a genuine issue
for trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
256 (1986).  All reasonable inferences and all credibility issues
are resolved in favor of the nonmoving party.  See id. at 255.


### Background

Land Air is a small trucking company, based in Williston,
Vermont, that specializes in transporting less that full truck
loads of goods.  David Dobrowski is the sales manager at Land
Air.  Linda Hawk had twenty years of experience in sales in the
transportation industry when Dobrowski hired her in December of
2003 as a sales representative for Land Air.

Hawk's sales work for Land Air required her to meet with
client representatives and take them to lunch.  Frank Skidmore,
who was a purchasing agent for FCI/Burndy, was a client
representative in Hawk's territory.  She contends that during her
meetings with Skidmore, he made inappropriate comments
culminating in one particularly offensive discussion.  The first
remark Skidmore made was that he gave Hawk the account with
FCI/Burndy because he liked her legs.  Hawk contends that she

2

immediately told Dobrowski about Skidmore's remark and that
Dobrowski told her to wear skirts when she met with Skidmore.
Dobrowski denies that Hawk told him about Skidmore's remark at
that time and denies that he told her to wear skirts.

According to Hawk, during their following meetings Skidmore
told her that he was "expecting to see some skin," referring to
Hawk's tan after a vacation, commented about scanty clothing worn
by two female tenants in a building he was overseeing, said that
he liked his doctor because she was female, and made remarks that
a previous sales representative at Land Air was "a wild cat."
During a meeting on May 20, 2004, Skidmore described to Hawk, in
graphic detail, his sexual exploits with a woman he met at a bar,
which included tying her sprawled across a bed while she was
nude.  Skidmore bragged that he was still seeing the woman and
that he was buying her lingerie after the lunch meeting with
Hawk.

Hawk and Dobrowski agree that they discussed work and
Skidmore's behavior on June 7, 2004.  Hawk contends that she
reported Skidmore's remarks, including the May 20 incident, to
Dobrowski and that he told her she should meet with Skidmore less
often.  Dobrowski contends that the June 7 meeting was to discuss
work issues, including Hawk's sales shortcomings, and that Hawk
was upset that she had not received credit for certain sales.

3

Dobrowski further contends that Hawk recounted Skidmore's remarks only after their discussion about her work issues and after he asked her how things were going with FCI/Burndy.

Hawk was out of work due to illness from June 10 to June 14. When she returned on June 14, Hawk told Dobrowski that she was filing a sexual harassment complaint.  Hawk filed the complaint with Matthew Smith, Director of Human Resources, on June 15. Hawk contends that Dobrowski told her the next day, June 16, that he was scheduling a six-month performance review of her work for June 22, 2004.  Dobrowski contends that he told Hawk about the performance evaluation on June 7, which she denies.

John Hansell, Director of Loss Prevention, and Matthew Smith attended the performance review on June 22 along with Hawk and Dobrowski.  At the meeting, Dobrowski gave Hawk a twelve-page performance evaluation that he reviewed point by point with her during the meeting.  The evaluation form indicates that it covered either a quarter or a year, although neither time period was marked on Hawk's form.  In the evaluation, Dobrowski criticized the number of new accounts Hawk had secured, her efforts to develop new business from existing accounts, her prospects for generating new accounts, her issues with the pricing department and corporate management at Land Air, her time management and organization, the lack of leads she sent to her

4

peers, her attention to relationship building with customers, her use of her own car instead of her company car, her attitude as a team member, and her ability or willingness to learn.

Hawk disputes the findings in the evaluation and Dobrowski's version of his expectations of her.  In particular, she contends Dobrowski had instructed her to concentrate on existing accounts and not to generate new business because her territory had not had a sales representative for a few months before she was hired. She also contends that her record was better than Dobrowski represented it to be and that most of Dobrowski's criticisms were inaccurate and petty.  She also believed then and continues to believe that Land Air was trying to manufacture reasons to fire her.  At the meeting on June 22, Dobrowski set a deadline for Hawk to "dramatically improve her performance."[2] Dobrowski Aff. ¶ 17.

Land Air gave Hawk a week off from work after the performance evaluation, due to her illness, and removed her from the FCI/Burndy account to prevent further contact with Skidmore. On July 14, 2004, two weeks after Hawk returned to work, Smith sent her a memo stating that FCI/Burndy had told him weeks

---

[2]Although Dobrowski states in his affidavit that he set a time for Hawk to "dramatically improve her performance" and that he extended the time due to her illness, he does not reveal what deadline he set for her.

5

previously that they could not investigate her complaint about
Skidmore because she had asked not to be identified.  Dobrowski
fired Hawk on July 16, 2004.


## Discussion

Hawk brings claims of sexual harassment and retaliation
under Title VII and RSA 354-A.  She contends that Skidmore's
remarks to her combined with Dobrowski's response constitute
actionable sexual harassment.  She also contends that Land Air's
decision to terminate her employment was in retaliation for her
sexual harassment complaint.  Land Air moves for summary judgment
on the grounds that Skidmore's remarks to Hawk were not
sufficiently severe and pervasive to be actionable, that it took
reasonable remedial action, and that Hawk was terminated because
of her substandard performance and not in retaliation for her
sexual harassment complaint.


A.  Sexual Harassment

Under Title VII, a plaintiff must prove that the sexual
harassment she experienced "was sufficiently severe or pervasive
so as to alter the conditions of [her] employment and create an
abusive work environment."  Valentin-Almeyda v. Mun. of
Aguadilla, 447 F.3d 85, 94 (1st Cir. 2006).  To be actionable

under RSA 354-A, sexual harassment must be "sufficiently severe and pervasive to alter the terms and conditions of [the employee's] employment."[3] <u>Madeja v. MPB Corp.</u>, 149 N.H. 371, 380 (2003).  A hostile work environment is assessed by considering "the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  <u>Valentin-Almeyda</u>, 447 F.3d at 94 (quoting <u>Harris v. Forklift Sys.</u>, 510 U.S. 17, 23 (1993)).  The parties agree that harassment by a third party who is not an employee of the plaintiff's employer may result in an actionable hostile work environment.  <u>See</u> 29 C.F.R. § 1604.11(e); <u>Turnbull v. Topeka St. Hosp.</u>, 255 F.3d 1238, 1244 (10th Cir. 2001); <u>Erickson v. Wisc. Dep't of Corrs.</u>, 358 F. Supp. 2d 709, 726 (W.D. Wis. 2005); <u>see also</u> N.H. Admin. Rules, Hum 403.02.

Hawk concedes that Skidmore's remarks until the May 20 incident, where he described his encounter with a woman he had picked up at a bar, were not particularly severe and were not

---

[3]Despite the use of "severe <u>or</u> pervasive" in the federal standard and "severe <u>and</u> pervasive" in the state standard, the court will rely on federal case law, as did the New Hampshire Supreme Court in <u>Madeja</u>, for both Hawk's Title VII and RSA 354-A claims.  <u>See</u> <u>Madeja</u>, 149 N.H. at 378.

pervasive.  She primarily relies on the May 20 incident to meet
the hostile work environment standard, along with her contention
that Dobrowski failed to respond appropriately to her first
complaint and to her complaint about the May 20 incident.  Land
Air argues that all of the remarks taken together do not
constitute sexual harassment.

Until the incident on May 20, Skidmore's remarks were
relatively trivial in the context of sexual harassment cases.
Although the May 20 incident injected a new level of crudity,
Skidmore's conduct was limited to five lunch meetings over the
course of about five months.  In that context, Skidmore's conduct
does not appear to be sufficiently severe or pervasive to
constitute actionable sexual harassment.  See Pomales v.
Celulares Telefonica, Inc., 447 F.3d 79, 84 (1st Cir. 2006)
(concluding that single incident where supervisor responded to
employee's invitation to accompany her on sales call by grabbing
his crotch and saying "it would be great to come with you" was
not sufficient and citing cases holding that five sexual advances
by a supervisor, two weeks of unwanted physical contact, and a
battery and two offensive remarks over six months were all
insufficient to be actionable).

Even if Skidmore's remarks and Dobrowski's reaction were
deemed to be sufficient to support Hawk's claim, however, Land

Air could avoid liability by showing that "it took reasonable
care to promptly correct the situation."  Fontanez-Nunez v.
Janssen Ortho LLC, 447 F.3d. 50, 56 (1st Cir. 2006); see also
N.H. Dep't of Corrs. v. Butland, 147 N.H. 676, 680 (2002).
Dobrowski responded to Hawk's complaint on June 7 by telling her
not to call on Skidmore as frequently as she had, which might
have been a somewhat lackluster response.  It is undisputed,
however, that about a week after she reported Skidmore's remarks,
including the May 20 incident, to Dobrowski and as soon as Land
Air received Hawk's complaint, she was removed from the
FCI/Burndy account and never again had contact with Skidmore.
Under these circumstances, Land Air is entitled to summary
judgment on Hawk's sexual harassment claim.

B.  Retaliation

     Hawk contends that the performance review done on June 22
and her subsequent termination, ostensibly on the ground that her
sales performance was substandard, was actually in retaliation
for her sexual harassment complaint.  Land Air insists that Hawk
was not performing at an acceptable level and that she was
terminated because of her performance.

     An employer may be liable under Title VII if it terminates
an employee because she "'opposed' an unlawful employment

practice under Title VII or 'made a charge . . . or participated in any manner in an investigation, proceeding, or hearing' under Title VII." Valentin-Almeyda, 447 F.3d at 94 (quoting 42 U.S.C. 2000e-3(a)). "A retaliation claim requires a showing that (1) the plaintiff engaged in protected conduct; (2) she was subjected to an adverse employment action; and (3) there was a causal connection between the first and second elements." Id. (citing Noviello v. City of Boston, 398 F.3d 76, 88 (1st Cir.2005)); see also Madeja, 149 N.H. at 378-79 (using Title VII standard for retaliation claim under RSA 354-A). Hawk believed that Land Air was trying to manufacture reasons to fire her.

In the context of an employer's motion for summary judgment, if an employee makes a prima facie case of retaliation, the employer must "articulate some legitimate, nondiscriminatory reason for the employee's termination." Azimi v. Jordan's Meats, Inc., 456 F.3d 228, 242 (1st Cir. 2006) (internal quotation marks omitted). If that showing is made by the employer, the plaintiff must establish that at least a genuine issue of material fact exists as to whether the employer's stated reason for terminating her was a pretext for retaliation. Id. Here, only Land Air's reason for terminating Hawk is disputed.

Land Air insists that Hawk was terminated because of her poor performance as demonstrated by the evaluation presented to

10

her on June 22, 2004.  Hawk believes that Land Air manufactured
reasons to fire her and that the June 22 performance evaluation
was a pretext to cover the real reason, which was that she had
filed a sexual harassment complaint.  Hawk points out that Land
Air's Employee Handbook provides for performance reviews of a new
hire after ninety days of work, which would be a quarter, and
after a year.[4]  She asserts that her evaluation, done after six
months, was contrary to Land Air procedures.  She also notes that
Hansell testified at his deposition that he had only attended one
other performance evaluation in his seven years with Land Air,
during which time about 300 employees had been terminated.  The
one other evaluation Hansell attended was for another employee
who made a sexual harassment complaint.  That employee was also
terminated.

Land Air and Hawk hotly dispute what Dobrowski told Hawk he
expected when she was hired, whether standards were set for her
performance, and whether she met the standards that were set.
Although Hawk agrees that in the end she did not meet Dobrowski's
expectations, she contends that he did not articulate those
expectations until the end of her employment.  The material

---

[4]The time periods provided in the Handbook are consistent
with the evaluation form that indicates an evaluation is to be
done after one quarter of work and then after one year.

factual disputes prevent Land Air from establishing a legitimate reason for its decision to fire Hawk for purposes of summary judgment.

In addition, the timing of the performance evaluation, the sexual harassment complaint, and the decision to terminate Hawk is suspect.  See Noviello, 398 F.3d at 86 ("[T]iming is often strongly suggestive of retaliation.").  The performance evaluation was scheduled about two weeks after Hawk complained to Dobrowski about the May 20 incident and a week after she filed her sexual harassment complaint.  The decision to terminate Hawk came only a month after she filed her sexual harassment complaint.  Further, the short time Land Air gave Hawk to "dramatically improve" her performance, which was about two weeks, suggests that it did not realistically expect her to meet Dobrowski's requirements.  Therefore, summary judgment is denied on the retaliation claim.

<u>Conclusion</u>

For the foregoing reasons, the defendant's motion for summary judgment (document no. 11) is granted as to the plaintiff's sexual harassment claim and denied as to her retaliation claim.

Now that the motion for summary judgment is resolved, the

court expects the parties to use their best efforts to reach a
settlement before trial, which is now scheduled for October 17,
2006.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
United States District Judge

October 2, 2006

cc:  Thomas M. Closson, Esquire
     David W. McGrath, Esquire
     John C. Sikorski, Esquire

13